**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

DENNIS J. SCHULLER,

        Plaintiff,

vs.

GREAT-WEST LIFE & ANNUITY
INSURANCE COMPANY,

        Defendant.

No. C-04-62-LRR

**ORDER**

---

**TABLE OF CONTENTS**

*I. PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II. FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *A. Material Facts Not In Dispute* . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
        *1. The Life Insurance Company of North America and*
            *Great-West group policies* . . . . . . . . . . . . . . . . . . . . . . . *4*
        *2. Schuller's disability claims* . . . . . . . . . . . . . . . . . . . . . . . *6*
        *3. Schuller's 2000 claim for disability benefits* . . . . . . . . . . . . . . *6*
    *B. Facts In Dispute* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*
        *1. January 23, 2003 letter* . . . . . . . . . . . . . . . . . . . . . . . . . *18*
        *2. Stroke v. TIA - February 21, 2003* . . . . . . . . . . . . . . . . . . . *19*

*III. STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . . . . . . . . *20*

*IV. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *21*
    *A. Choice-of-Law for Schuller's Claims* . . . . . . . . . . . . . . . . . . . . . . *21*
    *B. Schuller's Bad Faith Claim - Count I* . . . . . . . . . . . . . . . . . . . . . *25*
        *1. Elements of a bad faith claim* . . . . . . . . . . . . . . . . . . . . . . *26*
        *2. Great-West had an objectively reasonable basis for its delay* . . . *27*
    *C. Schuller's Intentional Infliction of Emotional Distress Claim - Count II* *34*

*V. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *38*

The matter before the court is Defendant Great-West Life & Annuity Insurance Company's ("Great-West") Motion for Summary Judgment (docket no. 13).

## I. PROCEDURAL BACKGROUND

On March 29, 2004, Plaintiff Dennis J. Schuller ("Schuller") filed a Petition at Law in the Iowa District Court In and For Linn County. Great-West removed the matter to this court on May 19, 2004, and invoked this court's diversity subject matter jurisdiction. *See* 28 U.S.C. § 1332. The court finds Schuller is an Iowa resident, Great-West is a Colorado corporation with its principal place of business in Colorado, and the amount in controversy exceeds $75,000.

Schuller's Petition at Law contains two counts: bad faith and intentional infliction of emotional distress.[1] Schuller alleges in April 1993, Great-West provided him with a certificate insuring him against disability. Schuller alleges he complied with all of the conditions of the policy and suffered an accidental injury which disabled him on December 28, 2000. In January of 2001, Schuller alleges his physician informed him he would not be allowed to return to work as a general dentist and, therefore, he became "duly eligible for benefits under the policy" on January 27, 2001. Schuller alleges Great-West "initially failed and refused to pay [him] the benefits to which he was entitled," later told him he was not entitled to benefits under the 1992 policy, threatened to discontinue payments, and failed and refused to make a monthly disability payment.

To support his bad faith claim in Count I of the Petition at Law, Schuller argues there was no reasonable basis for Great-West to delay or deny him benefits under the disability policy. He also argues Great-West knew or should have known the denial or

---

[1] The Petition at Law also contained a third count—one seeking a declaratory judgment—but on July 8, 2005, the parties filed a joint motion to dismiss Count III of the Petition at Law. The court granted the joint motion to dismiss on July 20, 2005.

delay was without basis. Schuller seeks actual damages, exemplary (punitive) damages, interest, and costs.

In support of the intentional infliction of emotional distress claim in Count II, Schuller argues Great-West's conduct was outrageous and that Great-West "intentionally caused emotional distress or acted with reckless disregard of the probability of causing emotional distress." Schuller claims he suffered "severe or extreme emotional distress" and that Great-West's conduct was the proximate cause of the distress. Schuller claims he is entitled to actual and exemplary (punitive) damages due to the conduct by Great-West, as well as interest and costs.

On May 18, 2005, Great-West filed the instant Motion for Summary Judgment (docket no. 13). On June 27, 2005, Schuller resisted the motion (docket no. 24). On July 11, 2005, Great-West filed a reply to Schuller's resistance (docket nos. 28 and 32). On July 25, 2005, Schuller filed a motion to keep record open (docket no. 35). Great-West did not resist the motion (docket no. 38). On August 15, 2005, the court ordered the parties to supplement the record (docket no. 39). Accordingly, on August 22, 2005, Schuller submitted an audiotape of two telephone conversations and a transcript of one of the conversations (docket no. 40). On August 23, 2005, Great-West filed a Supplemental Summary Judgment Brief with transcripts of both telephone conversations (docket no. 41). On August 30, 2005, Schuller submitted a Resistance to Defendant's Supplemental Summary Judgment Brief (docket no. 42). The court held a telephonic hearing on the Motion for Summary Judgment on September 15, 2005. Attorney James W. Affeldt represented Schuller and attorney Douglas R. Oelschlaeger represented Great-West. Finding the Motion for Summary Judgment to be fully submitted and ready for decision, the court turns to consider it.

## II. FACTS

### A. Material Facts Not In Dispute

#### 1. The Life Insurance Company of North America and Great-West group policies

The American Dental Association ("ADA") maintains a group disability insurance plan for its members who elect coverage and pay the required premiums. Great-West has administered the plan since November 1, 1992. Before November 1, 1992, the group policy insurer was the Life Insurance Company of North America ("LINA"). Schuller is a dentist and member of the ADA who first elected coverage under the plan on February 16, 1977. For approximately twenty of the last twenty-five years, Schuller has collected disability benefits under the ADA plan for several claims based upon an injury to his right wrist.

Prior to the November 1, 1992, transition from LINA to Great-West, the ADA approached Great-West to see if Great-West would insure the group disability plan the ADA had offered to its members through LINA. Great-West agreed to administer the ADA disability insurance plan. Great-West and the ADA agreed to maintain the same premium rates, coverage options, and many of the same contract features at the inception of the change. Like the prior LINA group policy, the Great-West group policy contained a provision that allowed the two-year Basic Benefit to extend for up to five years in the event the disability was the result of an "accident," as defined by the terms of the plan. The Great-West policy also continued the terms of the LINA policy that required an insured member be placed into suspended status after such member had elected the Basic Benefit and received maximum benefits. When an insured was in suspended status, he or she was not eligible for future coverage and, therefore, did not receive premium invoices. The policy provides that, if the insured recovered from his or her disability and returned to actively working full time for a specified period of time, the insurer could reinstate

coverage. Reinstatement occurs by paying premiums due from the date of recovery and allows the insured to become eligible for coverage under the plan, that is, eligible to make another claim in the event of a future disabling condition. The goal was to prevent the change of insurers from interrupting any insured's individual coverage. The new Great-West policy provided that any eligible member who was insured under the prior LINA group policy on October 31, 1992, would become automatically insured under the Great-West group policy.

Great-West issued individual certificates to ADA members at the time of the change from LINA to Great-West. Each certificate contained an effective date which corresponded to LINA's records. The effective date was typically the last date the insured had made a change to his or her coverage under the LINA group policy. Schuller's certificate, received in April of 1993, showed a "Certificate Effective Date" of "01 MAY 1990." That date is the date LINA reinstated Schuller on its records after some internal confusion about his eligibility.

Several years after Great-West became the plan insurer and administrator, Great-West and the ADA agreed to amend the policy in various respects. A new group policy was enacted on May 1, 1997. The amendments eliminated the five-year accidental benefit provisions under the Basic Benefit and made two years the maximum time period benefits were available, regardless of the reason for disability. Great-West notified its insureds of the amendments in advance of the May 1, 1997 effective date. It included a letter to the insureds from the ADA in the April 1997 semi-annual billing statement explaining the amendments. New individual certificates were issued and sent to currently enrolled members in February of 1998. Schuller did not receive a certificate because he was not enrolled as a policy-holder at that time.

### 2. Schuller's disability claims

Schuller injured his right wrist during a fall at Hy-Vee in April of 1979. He submitted a claim to LINA. LINA paid him five years of Basic Benefits between May of 1980 and May of 1985. Schuller submitted a second claim for benefits based upon his right wrist in 1985. LINA again paid him Basic Benefits from August of 1985 through May of 1986. On February 4, 1987, Schuller submitted a third claim to LINA based upon a right wrist injury resulting from a fall. LINA paid him five years of Basic Benefits between February of 1987 and March of 1992. On August 25, 1992, Schuller submitted a fourth claim of injury to his right wrist to LINA. LINA determined the disability was caused by an "accident" because Schuller reportedly hurt his wrist while he was trying to catch himself during a fall. It paid Schuller another five years of Basic Benefits from August 1992 through September 1997.

After Schuller received his fourth round of benefits, he submitted a letter in which he stated he had returned to work full-time on June 28, 2000. Great-West sent him a letter on August 24, 2000, which reinstated his disability coverage.

### 3. Schuller's 2000 claim for disability benefits

Although the claim form was dated April 6, 2001, Schuller submitted his fifth claim for disability benefits in a letter dated April 16, 2001. In the claim form, Schuller stated the nature of his present disability was an "accidental injury of right wrist." Schuller further explained: "Joint capsule popped out of my wrist most recently on 12/28/00 while I was working on a patient." Schuller claimed he first received medical treatment for the injury on December 20, 2000, from Dr. W. Gene Cretsinger ("Dr. Cretsinger"), a chiropractor from Cedar Rapids. In the claim form, Schuller further disclosed he had been treated by four different physicians for his right wrist since 1979.

Schuller also submitted a letter from Dr. Cretsinger dated April 6, 2001.  Dr. Cretsinger provided "an overview" of Schuller's "debilitating hand condition."  Dr. Cretsinger outlined Schuller's medical history regarding his hand.  Dr. Cretsinger explained Schuller first injured his hand in 1979 in "an accidental fall."  Schuller underwent surgery on his right hand at the Mayo Clinic in July of 1980.  He returned to work, but "the pain in his wrist returned after a few months and he was forced to leave his dental practice."  After "an extended period of rest," Schuller opened his own dental practice in late 1984 and his wrist pain soon returned.  He again underwent surgery at the Mayo Clinic in December of 1985.  Schuller returned to work in mid-1986 and the wrist pain returned after a few months.  Dr. Cretsinger wrote in his letter to Great-West that the Mayo Clinic surgeon, Dr. Linscheid, informed Schuller in early 1987:

> [S]caphotrapizial impaction syndrome . . . could return when Dr. Schuller's wrist is exposed to the repeated bending and twisting that is required in the practice of dentistry. . . . The repetitive forces and hand positioning required to perform dental procedures is sufficient to cause tissue breakdown over a few months of repeated use.

Dr. Cretsinger further wrote in his initial letter to Great-West that Schuller again returned to dental work in mid-1992.  After a few months of working as a dentist, Schuller experienced pain in his wrist and stopped working as a dentist.  According to Dr. Cretsinger, Schuller returned to work full-time on June 26, 2000.  Dr. Cretsinger wrote:

> [Schuller] did remarkably well until mid December.  He worked until December 15, then took off until December 27 to see if [his] wrist condition would improve.  He returned to work on December 27 [but] was no longer able to work past December 28, 2000.

Dr. Cretsinger explained that, when he examined Schuller, Schuller's wrist was "swollen, inflamed and painful."  Dr. Cretsinger, however, did not give an examination date.

Great-West assigned Martha Miller ("Miller"), a Senior Disability Claims Consultant, to handle Schuller's claim. As a result of Schuller's claimed injury date of December 28, 2000, Miller originally evaluated the claim under the Great-West group policy effective May 1, 1997. Miller began processing the claim by writing two letters on May 8, 2001, and July 20, 2001, to Cigna, LINA's parent company. In the letters, Miller sought information about Schuller's condition. Cigna never responded. In an August 27, 2001 telephone conversation with a Cigna employee, Miller learned Schuller had been paid the maximum benefit for his August 1992 claim. The claim was treated as an accident, which entitled Schuller to five years of disability benefits. Those benefits ended on September 23, 1997.

During a telephone conversation between Schuller and Miller on July 26, 2001,[2] Miller informed Schuller that Great-West would be recording the call.[3] Then, Miller asked whether Schuller was still disabled and whether he was currently having symptoms. She questioned why he would continue going back to dentistry if he had an incurable condition. Schuller agreed that his condition was not curable but informed Miller that he felt he had nothing to lose by trying to go back to dentistry after being disabled for eight years. Schuller further explained that he had attempted to go back to school three different

---

[2] After all summary judgment documents were submitted to the court, Schuller filed a request to keep the record open; he also for the first time notified Great-West that he had a tape recording of an October 8, 2001 conversation between himself and Miller. Pursuant to the court's order, dated August 15, 2005, Schuller submitted a copy of the audiotape on August 22, 2005 (docket no. 40). One side of the audiotape is a recording of the July 26, 2001 conversation, and the other side of the tape is a recording of another conversation with Miller on October 8, 2001.

[3] Due to malfunctioning recording equipment, the conversation was not recorded by Great-West, but it was recorded by Schuller.

times, but that the schooling "did not work out." Miller informed Schuller that his claim was subject to the May 1, 1997 Great-West group policy and that the maximum period of payable benefits would be two years, regardless of whether sickness or accident caused the claimed disability. The audiotape and Miller's notes of the conversation indicate Schuller was upset when he learned of the 1997 ADA plan changes. During the conversation, Schuller told Miller that he was unaware of the plan amendments because he had never received a new policy or certificate from Great-West. Instead of waiting for the information from Cigna, Miller decided to make a claim decision while on the telephone with Schuller. Miller was sympathetic when Schuller expressed concern about being able to buy groceries due to the fact he had not received any benefits. During the call, Miller informed Schuller his claim would be approved and Miller assured him that the back payments would be sent to him the next day. Miller told Schuller additional information would be requested of him in order to complete the processing of his benefits, because, pursuant to the 1997 policy, his disability income could not be greater than the income he earned while he was working—the benefits would be "offset." Both parties were civil during the entire conversation and, at times, friendly. At the end of the conversation, Schuller told Miller he appreciated her help and told her to "take care."

In a letter dated the following day, or July 27, 2001, Miller formally informed Schuller that Great-West had approved his claim for benefits and that they would be administered under the 1997 group policy. The 1997 policy was different from his former policy in two important respects: (1) "the Maximum Payment period for Total Disability or Residual Disability was changed to 24 consecutive months for both accident and sickness"; and (2) the policy "now also includes a Loss of Earnings offset and a Relation of Earnings to Insurance offset." Great-West requested income tax information from Schuller due to the offset provision. The letter also informed Schuller that he became

eligible for benefits on January 28, 2001, because his disability began on December 29, 2000.  The letter stated his benefits checks for January through July of 2001 "have been forwarded under separate cover."  Schuller does not dispute receiving those checks as stated in the letter and, in fact, thanked Miller for the benefit checks in a letter dated August 13, 2001.

In the August 13, 2001 letter, Schuller demanded that his 2000 claim be handled under the 1992 Great-West group policy.  He stated: "I was absolutely shocked when you told me that my disability insurance policy was drastically changed without my knowledge."  In the letter, Schuller also made an additional claim for benefits for the August 25, 1992 disability claim—the same claim for which he had already been paid five full years of benefits by LINA.  Schuller argued that the effective date of the Great-West policy was May 1, 1990, and put Great-West on notice: "[C]onsider this letter to be my formal notice of claim for the time period of 60 months beginning 30 days after the time of my disability that began August of 1992. . . . Please send me the necessary forms for filing proof of loss."

In an August 27, 2001 letter, Miller wrote Schuller and expressed confusion about his request for benefits for the August 1992 claim.  She denied his request and explained that LINA had already paid him full benefits for the claim and Great-West did not become the  administrator of ADA's plan until November 1992.  The letter also informed Schuller that his benefits checks would be sent on the eighteenth day of each month and he would receive checks through the expiration date of the two-year benefit period, which was January 27, 2003.

In a letter dated September 4, 2001, Schuller's primary doctor, Dr. Cretsinger, informed Great-West that the origin of Schuller's 1992 wrist problem was his fall in Hy-Vee in April of 1979.  Dr. Cretsinger wrote a three-page letter detailing the problems

Schuller had with his wrist since 1979. Dr. Cretsinger reported Schuller's hand did not heal properly after the initial fall, so he underwent wrist surgery in 1980. In October of 1985, Schuller's right hand was re-injured, so he again underwent surgery in December of 1985. Dr. Cretsinger reported Schuller's hand began to improve by 1990 and in early-1992, he returned to work as a general dentist. On August 24, 1992, Dr. Cretsinger reported Schuller had another "accident." He lost his balance while reaching, caught himself with his right hand, and then had intense pain and swelling in his right hand and wrist. Dr. Cretsinger informed Great-West that he treated Schuller thereafter, but that "Dr. Schuller remained disabled from his occupation."

On September 13, 2001, Schuller wrote Miller a letter which mainly dealt with his renewed claim for additional benefits for the August 1992 claim, an issue he chose not to litigate.

On October 4, 2001, Miller wrote an internal memorandum entitled "ADA Referral" to her supervisor, Gina Goodreau ("Goodreau"). Miller asked Goodreau to "respond to [Schuller's September 13, 2001] letter regarding contractual issues of the plan." In the memorandum, Miller acknowledged Schuller was "very distressed to learn that his basic benefit . . . was amended in May 1997 to pay a maximum two years sickness and accident." On October 4, 2001, Miller wrote a letter to Schuller which explained Goodreau's involvement.

Schuller had a telephone conversation with Miller on October 8, 2001. Schuller taped the conversation. The audiotape shows that Miller and Schuller calmly and professionally conversed. During the conversation, the two debated the applicability of the 1992 and 1997 policies, and the fact that, as of May of 1997, the ADA no longer offered a policy which payed a full five years of Basic Benefits for disabilities resulting from accidents. All coverage was changed to a maximum of two years. Schuller claimed

he never received the 1997 policy, and Miller guessed that Great-West may not have sent him the amended policy because he was collecting disability benefits at the time, rather than paying premiums.  Schuller argued that even though LINA had paid him full benefits under his ADA policy for his 1992 claim, Great-West still owed him Basic Benefits for that claim because he had a contract with Great-West which was "backdated" to 1990.  Miller explained that the 1992 policy was no longer in effect, because Schuller had exhausted all benefits under that policy.  Miller provided Schuller with the ADA's telephone number and explained that she had referred his case to her supervisor.  Miller also commented that she personally did not believe Schuller should have been reinstated in 2000 by Great-West, but had been instructed by Goodreau that her opinion about his reinstatement was irrelevant and that he was owed benefits.  During the telephone conversation, Miller and Schuller also debated whether his injury was from an accident or a sickness.  Miller insisted Schuller never had an accident but, instead, aggravated a pre-existing problem with his "unstable hand."  Conversely, Schuller insisted he had an unforseen accident when he extracted a tooth.  They agreed that his hand was a "problem" and that if he had surgery he would lose the dexterity he needed to be a dentist.  Schuller agreed that he needed to start thinking about other careers.  At the end of the conversation the two agreed to disagree.  They remained very friendly throughout the conversation and, at the end, Schuller said:  "Well, thanks very much for your help. . . . Have a nice day."

Schuller did not receive his October 2001 benefits check until mid-November of 2001.  In a November 13, 2001 letter from Schuller to Miller, Schuller mentions the following:  "Also, I still haven't received my benefit check for October.  The last check that I received was for 9/1 through 9/30."  The October check was generated by Great-West on November 15, 2001, and the subsequent checks, including Schuller's November benefit check, were unaffected by the tardy October check.

On November 30, 2001, Goodreau wrote a letter to Schuller responding to his September 13, 2001 letter. The letter set forth information regarding the 1992 transfer of the ADA group policy between LINA and Great-West. Goodreau explained: "You have received maximum benefits for your August 1992 claim and are not eligible for additional benefits for that claim." The letter goes on to deal with Schuller's 2000 claim. Goodreau concluded that the amended 1997 policy would apply to Schuller's 2000 claim.

On December 17, 2001, Schuller responded to Goodreau's letter with a four-page letter. Schuller's letter focused on Schuller's request for $120,000 plus 8% compound interest for his 1992 claim. On February 19, 2002, Schuller sent another letter to Goodreau demanding a response to his December 17, 2001 letter.

On March 4, 2002, Goodreau advised Schuller of Great-West's decisions regarding his "claims." She stated:

> We agree that the effective date of your insurance under the ADA disability insurance program predates Great-West Life's administration; however, that does not validate the incorrect conclusion that you carried two distinct and separate policies, or that you had overlapping coverage with LINA and Great-West Life. There is only one disability insurance program offered by the ADA to its members. Your August 1992 claim was incurred during LINA's administration and therefore was paid in full by LINA. You are not entitled to duplicate benefits under the ADA disability insurance program for a claim that has already been adjudicated and maximum benefits paid. This is our final determination with regard to this matter.

In the letter, Goodreau also informed Schuller that the 1992 policy, rather than the 1997 policy, would apply to his 2000 claim—the outcome Schuller desired. Goodreau found Schuller was in suspended status and not practicing when the amendments were made in 1997 and, therefore, he was in the unique position of not receiving notice of the 1997

policy changes. The letter also informed Schuller that Great-West would be conducting an investigation into his medical history to determine "the status of [his] disability and [his] eligibility for an extension of benefits related to an accident." It goes on to explain: "[w]e will be writing to all physicians disclosed on your initial claims form for complete copies of your medical records and diagnostic test results. . . . Once our review is complete, we will communicate our benefit determination in writing."

On March 25, 2002, Dr. Cretsinger wrote Great-West an additional letter. Dr. Cretsinger explained that he was writing because "Dr. Schuller has requested clarification of the cause of his recent disability." Dr. Cretsinger further stated: "In retrospect I believe that Dr. Schuller's current disability is most directly due to the accidental injury that he sustained on 11/28/00 while performing a dental procedure." He explained:

> My records for 11/29/00 indicate that this was the first complaint of wrist discomfort in the five months he had returned to his dental work. I do recall that Dr. Schuller reported that the previous day[,] 11/28/00[,] he had experienced sharp and intense pain in his right wrist while forcefully gripping and twisting his hand during a dental procedure. His hand was still uncomfortable at the time of his 11/29/00 appointment.
>
> Dr. Schuller's hand progressively got worse over the next month until the joint capsule ruptured on 12/28/00 terminating Dr. Schuller's dental career. . . .

Dr. Cretsinger's "Daily Progress Notes" for Schuller show the following entry: "**DOS 11/29/00:** Dennis presents with a mild ache and soreness in his hand. He said that he's been working it hard and began to bother." The Daily Progress Notes further show that Schuller had appointments with Dr. Cretsinger again on December 6 and 13, 2000. At each of those appointments, Dr. Cretsinger noted that Schuller complained of aching in his

right wrist. Although Dr. Cretsinger's letter states that Schuller's "joint capsule ruptured" on December 28, 2000, nothing in Dr. Cretsinger's Daily Progress Notes mentions Schuller's ruptured joint capsule. In fact, Dr. Cretsinger's Daily Progress Notes show that Schuller had appointments on December 20, 2000, and January 5, 2001, and did not have appointments with Dr. Cretsinger at any time between those dates. The Daily Progress Notes show:

> **DOS 12/20/00:** Dennis reports that he is taking next week off to rest his wrist and see if it recuperates. He also states that he is not doing well with discomfort and the intense workload has caused him to be sore and achy all the time in the wrist. He also states that he expected to go back in a week and a half and see how it works for him. . . .

> **DOS 1/5/01:** Dennis reports that he went back to work a couple of times but is not better. He stated that his last work day was Thursday the 28th of December and that he is not expected to go back to work or be capable of doing the job he was hired to do.

Great-West's internal consulting physician, Dr. P. Karakusis ("Dr. Karakusis"), examined Schuller's medical records. In the Medical Referral Form (Response) dated July 15, 2002, Dr. Karakusis wrote:

> The insured suffered an accidental traumatic injury to the wrist that required surgical intervention in 1980 then again in 1985. The surgical procedure performed resulted in an expected reduction in function of the wrist such that the insured's ability to practice dentistry from that point in time forward was questioned by the insured's treating physicians. However, the insured continued to practice dentistry experiencing repetitive trauma to the wrist as anticipated due to the physical requirements of his profession. Ultimately intractable pain precipitated by the practice of dentistry resulted in uncontested

disability. *No additional accidental injury is documented that might have exacerbated the insured's condition.*

(Emphasis added).

On January 22, 2003, Schuller received his twenty-fourth benefit check for the 2000 claim. The next day, Miller wrote Schuller and told him Great-West had made its final decision regarding whether he was entitled to two or five years of benefits (i.e. whether his injury was due to sickness or accident) on his 2000 claim. The January 23, 2003 letter reads, in pertinent part:

> You may recall that your claim was approved on July 27, 2001 with a two year benefit period; however, due to your unique circumstances, we agreed to administer your claim under the contract that was in effect prior to May 1, 1997. Subsequently, you submitted that your disability beginning December 29, 2000 was also due to an accident. The new contract does not make a distinction between disability due to accident or sickness; however, the old contract does make this distinction. Therefore, we have changed our original determination and will extend benefits for the full five year benefit period set forth in the contract prior to May 1, 1997, as long as you remain totally disabled according to the terms of the contract, but not beyond January 27, 2006.

On February 21, 2003, Schuller was admitted to St. Luke's Hospital Emergency and Trauma Center in Cedar Rapids, Iowa. He was 53-years-old. He reported he had been "out walking with his wife," became overheated, and returned home to remove his coat. The treating physician, Dr. Craig Hovda, noted the following:

> [Schuller] subsequently experienced an episode of weakness in particularly his left arm. He had left facial drooping, according to his wife, and he had some difficulty speaking, said he had a high-pitched voice. He has had a global headache. . . . He is totally asymptomatic at the present time.

Dr. Hovda's assessment of Schuller was a "probable TIA." A TIA is a transient ischemic attack and is defined as follows:

> Temporary interference with blood supply to the brain. The symptoms of neurological deficit may last for only a few moments or several hours. After the attack no evidence of residual brain damage or neurological damage remains. It is not necessarily true that individuals who have experienced transient ischemic attacks will within the predictable future develop a full vascular occlusion and have a stroke.

*Taber's Cyclopedic Medical Dictionary* 2024 (17th ed. 1993).

Dr. Hovda also consulted another doctor, Dr. Mark Young, and reported "[Schuller] was placed on aspirin one a day, feeling this might be a complex migraine headache as well." Schuller "appear[ed] to be healthy and there was absolutely no cranial nerve deficit." The doctors believed a "head CT" was unnecessary. Schuller had no "facial asymmetry" when the emergency room doctors treated him and was "discharged in good condition."

After Schuller had been notified that he was to receive the full five years of benefits for his 2000 claim under the policy he preferred, he wrote a "letter of dispute" to Great-West. The letter is dated July 15, 2003. On August 1, 2003, Goodreau wrote a brief letter in response to Schuller's allegations. Schuller asked for further explanation in an August 27, 2003 letter. On September 16, 2003, Goodreau responded again. In that final letter, Great-West explained that it considered the "entirety" of Schuller's accusations "to be without merit." Goodreau wrote:

> You have previously exhausted maximum benefits under this plan on three separate occasions. The current claim being administered by Great-West Life is your fourth claim for maximum benefits. We have given your current claim the

> benefit of the doubt and approved it based upon the maximum
> allowable benefit period provided by the terms of the plan.
>
> In response to your proposed settlement of $2.4 million,
> together with exemption from all plan changes made by the
> ADA, and duplicative benefits for the 1992 claim; we
> respectfully decline. To the extent our prior letter was not
> clear, our position in this matter remains unchanged from the
> terms outlined on March 4, 2002.

There was no further correspondence between the parties until the lawsuit was filed on March 29, 2004.

### B. Facts In Dispute

### 1. January 23, 2003 letter

Great-West, via Miller, sent Schuller a letter dated January 23, 2003, that advised Schuller his benefits would be extended from the two years previously promised to a full five years. Schuller claims he did not receive the January 23, 2003 letter from Miller at that time. Instead, Schuller claims he received the letter and information for the first time shortly after March 12, 2003, when Miller sent him a copy of the January letter enclosed in the same envelope as the letter dated March 12, 2003.

Believing he had received his final benefits check on January 22, 2003, Schuller "tried to return to work too soon" on January 23, 2003. He began practicing dental procedures on plastic dental models. When practicing on February 7, 2003, he "had a severe pain in [his] wrist and the joint capsule popped out." Although Schuller claims he "promptly and repeatedly visited [his] physician for pain control," Schuller admits he did not have an appointment with Dr. Cretsinger until three days later, that is, on February 10, 2003. Schuller claims that the pain was so unbearable he was unable to sleep at night. He further stated in his July 15, 2003 letter to Great-West:

> I was in pain with inadequate rest and I was still worrying
> about my insurance being cut off. It felt like I was ready to
> explode with all the stress. The next thing I knew on 2/21/03
> I had a stroke(TIA)! It is very clear in my mind and heart that
> there is no way that I would have tried to return to work too
> early had it not been for the pressure that Great-West wrongly
> placed on me. The needless wrist reinjury resulted in the pain
> that led to the lack of sleep. All of these factors together
> resulted in my stroke. This complete chain of events were the
> direct result of Great-West's improper behavior and they are
> directly responsible.

In the same letter, Schuller further blames Great-West for the treating physician's directive to take an adult aspirin each day for the rest of his life.

Schuller claims he did not believe he was going to receive benefits checks beyond the one he received on January 22, 2003. The receipt of his twenty-fifth benefit check on February 22, 2003, "was the first indication provided by Great-West that [he] was going to be paid past two years."

Great-West, on the other hand, claims Schuller should have received the January 23, 2003 letter shortly thereafter and was timely notified of the extension of benefits. Great-West contends Schuller's reliance on language in the March 12, 2003 letter ("Since it is now evident that you did not receive our original letter, we are enclosing a copy of that letter . . . .") is unavailing. Neither Miller nor any other Great-West representative admitted that he never received notification of the extension of benefits to five years. As far as Great-West is concerned, Schuller received the January 23, 2003 letter that was mailed to him.

### 2. Stroke v. TIA - February 21, 2003

As noted in Section II(A)(3) above, Schuller was admitted to the St. Luke's Hospital Emergency and Trauma Center on February 21, 2003, and Schuller was assessed by Drs.

Craig A. Hovda and Mark Young. Throughout the summary judgment filings, Schuller argues that he had a "stroke" on that date. Great-West disagrees with that characterization of the evidence and argues that Schuller merely had a TIA.

Schuller chose not to submit an affidavit from a medical doctor or other documentation of his condition beyond the one-page emergency room report. The report is undisputed. The treating emergency room physician assessed Schuller as having a "probable TIA." Great-West asserts that a TIA is not the same condition as a stroke, due to the definition of TIA found in *Taber's Cyclopedic Medical Dictionary* and the *Dictionary of Medical Terms for the Nonmedical Person*.

### III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when the record shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). An issue of fact is "genuine" if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods*, 409 F.3d at 990 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact "'that might affect the outcome of the suit under the governing law . . . .'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus.*, 475 U.S. at 587-88. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* at 587.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## IV. *LEGAL ANALYSIS*

### A. *Choice-of-Law for Schuller's Claims*

Schuller alleges in his Petition at Law that Great-West is liable under theories of bad faith and intentional infliction of emotional distress. In its Brief in Support of Motion for Summary Judgment, Great-West argues Illinois law applies to Schuller's claims due to the Illinois choice of law provision in the 1992 group policy.[4] Schuller argues Iowa law should apply to his claims, because the choice of law provision in the policy does not apply to his "tort claims."

Page one of the ADA's 1992 group policy states: "This policy is subject to the laws of the State of Illinois." Page twenty-four of the 1992 group policy, under the bolded heading "Conformity With Statutes," provides: "This policy is amended to comply at all times with the minimum requirements of the State of Illinois which apply to Group Long Term Disability Insurance." The Individual Certificate Schuller received in April 1993

---

[4] Great-West also preserved the governing law issue in its Answer by stating: "Plaintiff's claims are governed by Illinois law pursuant to Illinois choice of law provisions contained in the contract at issue."

for the 1992 group policy contained nearly identical language in the "Conformity With Statutes" section on a page listed as "1105 US-12." The certificate's language provides: "The Group Policy is amended to comply at all times with the minimum requirements of the State of Illinois which apply to Group Long Term Disability Insurance."

This court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, therefore, the substantive law governing Schuller's claims is Iowa law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (determining federal courts whose jurisdiction is based solely on diversity must apply state, rather than federal, substantive law in order to prevent parties from forum shopping). The court must give effect to the "whole law" of Iowa, which means the court must also apply Iowa's choice of law rules in determining the applicable law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (ruling the conflict of laws rules to be applied by federal courts sitting in a state must be those rules utilized by that state's courts); *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621 (8th Cir. 2004) ("The district court, in determining which state's substantive law governed, should have applied the forum state's conflict-of-laws rules, as opposed to simply applying the forum state's substantive law. In other words, the district court should have given effect to what is called the whole law of the forum.").

The Iowa Supreme Court has, in turn, adopted the Restatement (Second) Conflict of Laws (1971) ["Restatement"] to determine which law to apply to various claims. *See Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987) (noting "Iowa has adopted the 'modern' choice of law rules, formulated in accordance with the Restatement (Second) of Conflicts . . . ." which includes the "most significant relationship" test); *see also Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996) (explaining that "[t]he theory behind this approach is that rather than focusing on a single factor, 'the court of the forum should apply the policy of the state with the most interest in the litigants and the outcome

of the litigation.'") (quoting *Fuerste v. Bemis*, 156 N.W.2d 831, 834 (Iowa 1968)). Therefore, conflicts regarding contract claims are governed by Chapter 8 (sections 186 to 207) of the Restatement and conflicts regarding tort claims are government by Chapter 7 (sections 145 to 174). *See* Restatement at §§ 145-174, 186-207.

To determine which chapters of the Restatement govern, the court must determine whether Schuller's claims are based in tort or in contract. Schuller correctly argues that his intentional infliction of emotional distress claim is a tort claim, not a contract claim. *See Eckles v. City of Corydon*, 341 F.3d 762, 769 (8th Cir. 2003) ("Intentional infliction of emotional distress is a state tort claim."). Schuller's bad faith claim is also correctly classified as a tort, although Iowa courts recognize it as a common law tort and the Illinois legislature has provided a statutory remedy. *See Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) ("We conclude it is appropriate to recognize the first-party bad faith tort to provide the insured an adequate remedy for an insurer's wrongful conduct.").

Therefore, according to Iowa's choice of law rules, both of Schuller's claims should be analyzed pursuant to Chapter 7 of the Restatement. Specifically, Section 145(1) provides: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement § 145(1). Section 6 provides:

> the factors relevant to the choice of the applicable rule of law include[:] (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty,

predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* at § 6(2).  Section 145 goes on to provide:

> Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* at § 145(2).

The provision in the Great-West policy stating, "[t]his policy is subject to the laws of the State of Illinois[,]" adequately covers disputes concerning how to construe the policy, but the language is not broad enough to govern the choice of law for Schuller's tort claims.  *See SNB Farms, Inc. v. Swift & Co.*, Nos. C01-2077, C01-2078, and C01-2080; 2003 WL 22232881, at *7, n.2 (N.D. Iowa Feb. 7, 2003) ("Parties may choose the law to apply to contract claims but may not do so for tort claims.  A contractual choice-of-law provision is not dispositive of the proper choice-of-law for related tort claims."); *see also Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445, 1458 (N.D. Iowa 1996) (holding the "chosen law of the contract" applied to the contract claims, but not to the tort claims); *World Plan Executive Council-U.S. v. Zurich Ins. Co.*, 810 F. Supp. 1042, 1046 (S.D. Iowa 1992) ("A contractual choice-of-law provision, however, is not dispositive of the proper choice of law for related tort claims.") (citing *United States v. Conservation Chemical Co.*, 653 F. Supp. 152, 176-78 (W.D. Mo. 1986)); *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 730 (Iowa 1995) ("Generally under Iowa law, choice of forum provisions that would deprive Iowa courts of jurisdiction they would

otherwise have are not legally binding in Iowa, but Iowa courts will consider them as one factor when determining whether to exercise jurisdiction."). Although each of Schuller's claims obviously arose out of the circumstances surrounding the policy, there is no indication in the policy that the parties intended to elect Illinois law as the forum for every contract-related claim. The narrow contractual language simply does not address the entirety of the parties' relationship. The court should, therefore, turn to the Restatement.

Applying the factors of Section 145 of the Restatement to the facts of this case, the court finds Iowa to be the place where the alleged injury occurred. Restatement § 145(2)(a). The place where the conduct causing the alleged injury occurred was in Colorado. *Id.* at § 145(2)(b). Schuller is a resident of Iowa. *Id.* at § 145(2)(c). Great-West is an insurance company based in Colorado and doing business in Iowa. *Id.* The court finds the "place where the relationship . . . is centered," to be Iowa. *Id.* None of the factors favor Illinois law. The balance of the factors in the Restatement's "most significant relationship" test favor Iowa law. Therefore, the court will evaluate Schuller's bad faith and intentional infliction of emotional distress tort claims in accordance with Iowa law.

### A. Schuller's Bad Faith Claim - Count I

In Count I of the Petition at Law, Schuller claims Great-West acted in bad faith in processing his 2000 claim for disability benefits. In response, Great-West first argues that Schuller's claim should be dismissed for failing to plead in conformance with Illinois law. Second, Great-West argues that Schuller is not entitled to relief because Great-West administered his claim in a timely fashion and ultimately paid him the maximum benefits under the policy.

### *1. Elements of a bad faith claim*

Iowa common law provides:

> In first-party, bad-faith claims, the plaintiff must show (1) the absence of a reasonable basis for denying the claim, and (2) the insurer knew or had reason to know that its denial was without a reasonable basis.

*Galbraith v. Allied Mut. Ins. Co.*, 698 N.W.2d 325, 328 (Iowa 2005). "The first element is an objective one; the second element is subjective." *Bellville v. Farm Bureau Mut. Ins. Co.*, --- N.W.2d ---, No. 02-1343, 2005 WL 1790609, at *2 (Iowa July 29, 2005).

A reasonable basis to deny a claim exists when the claim is "fairly debatable." *See Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 861 (Iowa 1991) ("Where a claim is fairly debatable, the insurer is entitled to debate it and there is no bad faith on its part in doing so."); *see also Bellville*, 2005 WL 1790609, at *2 ("[I]f reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable."). The debate may be regarding an issue of fact or law. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 396 (Iowa 2001). "An insurance company has the right to debate claims that are 'fairly debatable' without being subject to a bad faith tort claim." *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 150 (Iowa 1998).

A plaintiff may prevail on a bad faith claim if he or she can show the insurer "lacked a reasonable basis for denying *or delaying* payment of the claim." *Galbraith*, 698 N.W.2d at 328 (emphasis added) (citing *Thompson v. U.S. Fid. & Guar. Co.*, 559 N.W.2d 288, 290-91 (Iowa 1997)). When analyzing a claim, an insurer "is not required to accept the insured's word . . . and may demand adequate documentation." *Id.* Such requests for documentation and any reasonable delay involved in seeking such documentation is permissible. *See id.* ("The insurer was not required to accept this affidavit as true on its

face and could reasonably take additional time to investigate [information contained in the affidavit].").

The issue of whether a claim is "fairly debatable" under prong one of the bad faith test is a question for the court:

> Whether a claim is fairly debatable can generally be decided as a matter of law by the court. That is because where an objectively reasonable basis for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law.

*Bellville*, 2005 WL 1790609, at *3 (citations and quotations omitted) (emphasis in original). "The focus is on the existence of a debatable issue, not on which party was correct." *Id.* (citing *Thompson*, 559 N.W.2d at 292). A court "do[es] not weigh the conflicting evidence that was before the insurer; [it] decide[s] whether evidence existed to justify denial of the claim." *Id.* (citing *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. Ct. App. 1992)).

### 2. *Great-West had an objectively reasonable basis for its delay*

The court finds that there was an objectively reasonable basis for both of Great-West's delays in determining whether it was going to pay Schuller disability benefits—both the delay between April 19, 2001, and July 26, 2001, and the delay between July 26, 2001, and January 23, 2003. Because his entitlement to disability benefits for his 2000 claim was "fairly debatable," Schuller fails to prove element one of the bad faith test and Great-West is entitled to summary judgment on Count 1.

The parties agree that Schuller became injured in December 2000 and did not submit his claim to Great-West until April 16, 2001.[5] Great-West received Schuller's claim

_____

[5] In letters Schuller wrote to Great-West, he seemed to blame Great-West for the
(continued...)

on April 19, 2001.  At the time Schuller made the claim for his December 2000 disability, Great-West knew that he was "on claim" with Cigna beginning on August 24, 1992, and that his premiums were suspended until June 29, 2000, the date he was reinstated because he had actively returned to work as a dentist.  Apart from that information, Great-West did not know very much about Schuller's history with the ADA disability policy.  The documentation submitted by Great-West shows that it made its first formal request to its predecessor, Cigna, for more information regarding Schuller's history on May 8, 2001, thirteen business days after it received Schuller's claim.  On July 17, 2001, Schuller inquired about his claim for the first time by letter.  Three days later, on July 20, 2001, Miller sent a reminder letter to Cigna, because it had not yet replied to Great-West's May 8, 2001 request for information.

There is no dispute that Schuller had been covered periodically by Great-West and its predecessor since 1977 when he first elected Basic Benefits coverage under the ADA group policy.  Prior to his reinstatement by Great-West in August of 2000, Schuller had collected disability benefits four different times due to injuries to his right wrist.[6]

---

[5] (...continued)
delay between the date of his injury (December 28, 2000) and the date he filed his claim (April 16, 2001).  Schuller's filings in this lawsuit clarify that he is not including this time period in his allegation that Great-West's delay was motivated by bad faith.  Nonetheless, the court finds it difficult to understand how Schuller can complain about the delay between April 19, 2001, and July 26, 2001 when he initially waited three and a half months to file his claim.

[6] The undisputed evidence shows that LINA paid Schuller the following disability benefits: five years of benefits between 1980 and 1985; benefits between August of 1985 through May of 1986; five years of benefits between 1987 and 1992; and five years of benefits between 1992 and 1997.  During the 15 years Schuller collected disability benefits, he received $2,000 per month, or a total of approximately $380,000 in benefits.

Therefore, after Schuller submitted his 2000 claim to Great-West, two different issues became problematic. One issue is whether Schuller had coverage for his 2000 claim under the 1992 policy or the 1997 amended policy. This was particularly important to Schuller, because the 1997 policy provided only two years worth of benefits for disabilities resulting from either an accident or a sickness. In contrast, the 1992 policy provided five years of coverage for accidental disabilities. The second disputed issue is whether Schuller was entitled to coverage at all. Due to his twenty-year history of collecting benefits for his right wrist, his request for benefits alone is objectively questionable.

The undisputed evidence shows that in August of 1992, LINA began paying Schuller benefits for a disability under the 1992 LINA policy. In November of 1992, Great-West became the administrator of the ADA's policy, but LINA continued to pay benefits to Schuller on the 1992 claim throughout September of 1997. In May of 1997, while Schuller was still collecting disability benefits from LINA and not paying premiums, the ADA amended its policy and eliminated the five-year benefit for accidental disabilities. All ADA insureds who were paying premiums in April of 1997 were sent new policies and certificates. Schuller did not receive the amended policy from Great-West because he was collecting benefits from LINA and was not reinstated until 2000. However, when Schuller submitted the claim for the 2000 injury, Miller proceeded as if Schuller had received notice of the 1997 amendments because she had never encountered an insured who had not received notice.

The July 26, 2001 telephone conversation between Miller and Schuller is the first time each party learned there was confusion about which policy applied; Schuller learned that Great-West believed his claim was subject to the 1997 policy while he believed he was covered under the 1992 policy. Despite this disagreement and Schuller's history of repeat injuries and disability collections Miller informed Schuller during the telephone

conversation that he would receive benefits for at least two years and they would continue to investigate whether he was eligible for five years worth of benefits under the 1992 policy. This three-month period of time between his claim and the payments was not an unreasonable delay, especially given Schuller's unique circumstances. *See Christensen v. Snap-On Tools Corp.*, 554 N.W.2d 254, 260-61 (Iowa 1996) (using the same "fairly debatable" standard in a worker's compensation case and concluding that an employer's delay of two months in paying benefits during an investigation was reasonable); *McKee v. Fed. Kemper Life Assur. Co.*, 927 F.2d 326, 327, 329-30 (8th Cir. 1991) (holding insurer's payment pursuant to life insurance policy two months and three days after its agent received proof of loss was reasonable where an Arkansas statute required payment within two months). *But see Kiesecker v. Webster City Custom Meats Inc.*, 528 N.W.2d 109, 111 (Iowa 1995) (affirming commissioner's conclusion that a ninety-day delay in payment of benefits was unreasonable).

After investigating the entirety of Schuller's unique situation—including his multi-decade relationship with Great-West's predecessor and his recurring disability—Great-West informed Schuller by letter dated January 23, 2003, that Great-West would be paying him for five full years of benefits. Schuller, however, claims that he did not receive the January 23 letter until March 2003. The court must view the facts in the light most favorable to Schuller and assume he did not receive the January 23, 2003 letter in a timely fashion. The court finds that although the issue of the receipt of this letter is disputed, there is no *material* fact in dispute. Even if the letter did not arrive in Schuller's mailbox until March, such a delay does not establish a bad faith claim. At most, there was a negligent clerical error in mailing the letter from Great-West or an error with the United States Postal System that was out of the control of Great-West.

The court finds that, as a matter of law, Schuller cannot show Great-West acted in bad faith in administering his 2000 benefits claim. With only a few months of delay, Schuller began receiving disability benefits checks in late July of 2001, as well as back-payments to January of 2001. There was a seamless administration of the payment of benefits checks between the twenty-fourth and twenty-fifth payments. The court further finds that, because the circumstances surrounding Schuller's claim were so unique, the amount of time Great-West spent investigating his case before paying him benefits was objectively reasonable. Great-West was faced with an insured who had collected disability benefits from LINA due to a disability with his right wrist four previous times between 1980 and 1997. Great-West reasonably examined medical reports and contacted physicians to determine whether Schuller's claimed disability was legitimate. *See Galbraith*, 698 N.W.2d at 328 (explaining that an insured may investigate and demand adequate documentation for a claim). Great-West was also reasonable in investigating whether Schuller had been properly informed of the May 1997 policy change, especially considering Schuller claimed he was due benefits under the 1992 policy and he was the only person the Great-West representatives had ever dealt with who was collecting benefits at the time of the change in 1997 and who had been reinstated at a later date. Schuller is not the typical insured and nothing about the time periods involved prove Great-West acted in bad faith.

Schuller further claims that Great-West acted in bad faith because Miller and Goodreau treated him poorly. Viewing the facts in the light most favorable to Schuller and giving him the benefits of all reasonable inferences that can be drawn from the facts, *Matsuchita Elec. Indus.*, 475 U.S. at 587-88, the court finds that each letter and the two recorded telephone conversations show that Great-West representatives were always polite and professional when dealing with Schuller. At no time did they attack, threaten, or

otherwise intimidate Schuller or treat him rudely. The court further finds that throughout this ordeal, Great-West gave Schuller the benefit of every doubt. Miller agreed to begin making payments to Schuller in July of 2001 before she had received information about Schuller's 1992 disability claim from LINA *and* before she had received income information from Schuller. Great-West agreed to administer Schuller's benefits under the 1992 policy and pay Schuller for five years of benefits, even though he was reinstated in 2000 when the more limited 1997 policy was in place. Long before this litigation ensued, Great-West agreed to pay Schuller every penny he was entitled to under his disability policy and then some.

The court further finds that Schuller has not established a bad faith claim by arguing that Miller intentionally withheld his October 2001 benefits check. Schuller alleges the October 2001 benefits check arrived a month late because Miller threatened and bullied him in a telephone conversation on October 8, 2001. A review of the tape-recording of the October 8, 2001 telephone conversation shows that Schuller's allegations lack merit. He argues that Miller "threatened" him and told him that, if he did not accept the coverage under the 1997 accident policy, she would terminate all of his benefits. When each of her statements are examined in context, it is abundantly clear that Miller did not threaten Schuller in anyway. Schuller claims he did not receive his October benefits check until he wrote to Goodreau because Miller was following through on her threat. Miller, on the other hand, explains the tardy check as an innocent mistake. She claims that she made a clerical error when she entered information into Great-West's electronic check production system (autogen) which automatically produces benefits checks when programmed by an employee. Great-West did not realize Schuller's October benefits had not been paid until it received a letter from Schuller on November 13, 2001. In the letter, Schuller requested additional payment for the 1992 claim. He also stated, "I still haven't received my benefit

check for October. The last check that I received was for 9/1 thru 9/30." Nowhere in the letter did he allege Miller purposely withheld the check to follow through on her verbal threats. In fact, the statement regarding the late check was a footnote to his demand for payment on his 1992 claim. Upon receipt of the letter, Miller claims she checked the autogen system and realized for the first time that she had made an clerical error regarding the October check. When she referred Schuller's case to Goodreau on October 4, 2001, Miller claims that she reprogrammed the autogen system to pay Schuller benefits through the end of December 2001. Miller now believes that when she reprogrammed the computer at that time, she accidentally and inadvertently "wiped out" the preprogrammed October payment. Immediately upon receiving Schuller's letter, Miller corrected the error and a check was generated for Schuller's October benefits on November 15, 2001. Schuller admits he received the check shortly thereafter and the following payments arrived in the mail on time.

The parties do not dispute that the October 2001 check was late. Indeed, it arrived in mid-November of 2001. Nonetheless, the court finds that the reason for the short delay of one payment out of the sixty payments scheduled to be paid to Schuller is not material. The telephone conversation upon which Schuller relies was a civil, non-threatening conversation. The fact of one tardy benefits check cannot sustain Schuller's burden of proof on the bad faith claim.

It is undisputed that, in accordance with the 1992 policy, Great-West paid Schuller disability benefits on Schuller's 2000 claim beginning on January 28, 2001, and continuing through today's date. Great-West intends to pay him the full five years—through January of 2006. Because Great-West had an objectively reasonable basis for delaying its initial decision and its final decision on his claim, Great-West is entitled to judgment as a matter of law on the bad faith claim. There are no material facts in dispute. Based on the

undisputed facts, the validity of Schuller's claim was, at the least, "fairly debatable." As such, Great-West is entitled to judgment as a matter of law on Count I of the Petition at Law.

### C. Schuller's Intentional Infliction of Emotional Distress Claim - Count II

In Count II of the Petition at Law, Schuller claims Great-West intentionally inflicted emotional distress while administering his 2000 disability claim. Great-West first argues that Schuller's claim for intentional infliction of emotional distress ("IIED") is duplicative of the bad faith claim and, therefore, preempted. Great-West asserts that Illinois law is applicable and that Schuller cannot prevail as a matter of law, because he has not satisfied the elements of an IIED claim.

The court has previously ruled in Section IV(A) herein that Iowa law applies to Schuller's IIED claim. Under Iowa law, "four elements must be established to make a prima facie showing of intentional infliction of emotional distress[.]" *Eckles v. City of Corydon*, 341 F.3d 762, 770 (8th Cir. 2003) (citing *Marks v. Estate of Hartgerink*, 528 N.W.2d 539, 546 (Iowa 1995)). Schuller must show:

> (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (citing *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)).

Here, Schuller fails to show the first prong of the IIED claim. "Outrageous" conduct has been described as conduct that is "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

civilized community.'" *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 70 (Iowa 2002) (*citing Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984)). "Substantial evidence" of such extreme conduct is required. *See Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990). "It is not enough to show that the defendant has acted with tortious intent or that [the] defendant has intended to inflict emotional distress, or that his conduct could be characterized by 'malice,' or by a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Kunau v. Pillers, Pillers & Pillers, P.C.*, 404 N.W.2d 573, 576 (Iowa 1987). *Cf. M.H. ex rel. Callahan v. State*, 385 N.W.2d 533, 539 (Iowa 1986) (concluding that outrageous conduct can be proven without showing that conduct is willful or wanton). The Iowa Supreme Court has, in the past, recognized IIED claims against insurers for refusal to pay benefits. *See, e.g.*, *Amsden v. Grinnell Mut. Reins. Co.*, 203 N.W.2d 252, 253 (Iowa 1972) (recognizing IIED claim against insurers, but affirming a directed verdict in favor of the insurers where the insurers did not immediately pay fire loss claim, but instead waited a reasonable period for an arson investigation).

Schuller appears to claim that his IIED claim is established for two reasons. First, Schuller contends Great-West treated him badly. Second, Schuller contends Great-West took over three months to determine whether he was eligible for Basic Benefits and then it took Great-West until 2003 to decide whether it would pay his claim for a full five years.

Schuller's first contention fails. The July 26, 2001, and October 8, 2001 telephone conversations between Miller and Schuller show that there was nothing outrageous about Miller or Goodreau's conduct. As evidenced by the audio-recorded conversations and correspondence, neither Miller nor any other Great-West representative were unprofessional when they addressed Schuller's claim. Although Miller repeatedly told Schuller during their telephone conversations that he was misinterpreting his insurance

coverage and was wrong, she was never rude to him. Miller even empathized with Schuller's situation and expressed concern for his ailing in-law. The conversations were cordial and ended with mutual greetings of thanks and well-wishes. Additionally, nothing in the letters from Great-West to Schuller come close to going beyond "all possible bounds of decency." *Ette*, 656 N.W.2d at 70. Miller's and Goodreau's conduct does not rise to the level of outrageous conduct.

Furthermore, there is nothing outrageous about the three months Great-West took to determine whether or not to pay Schuller's claim or the twenty-one months it took to determine whether he was eligible for the full five years of benefits. *See Wright v. DaimlerChrysler Corp.*, 220 F. Supp. 2d 832, 845 (E.D. Mich. 2002) (explaining that "'wrongful, bad faith termination of benefits is not sufficiently outrageous to support a claim for intentional infliction of emotional distress'") (citing *Atkinson v. Farley*, 431 N.W.2d 95, 97 (Mich. Ct. App. 1988)); *Reedy v. White Consol. Indus., Inc.*, 890 F. Supp. 1417, 1443 (N.D. Iowa 1995) (holding that if insurer's obligation to pay benefits is "fairly debatable" under a bad faith claim, then "refusing to pay the benefits cannot be outrageous within the meaning of the tort of intentional infliction of emotional distress"); *see also Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699-700 (Tex. 1994) (citing cases which stand for the proposition that a refusal to pay insurance benefits, even if done in bad faith or arbitrarily, is not alone enough to support a claim for IIED). Nothing about these time periods, which the court has already determined to be reasonable, were extreme, autrocious, or utterly intolerable.

In sum, the court concludes Schuller cannot satisfy the elements of an IIED with the facts he has presented. Taking the undisputed evidence in the light most favorable to Schuller, a reasonable jury could not find that Great-West acted outrageously. Summary judgment is appropriate on Count II.

36

Schuller also fails to establish the third prong of the IIED test. Schuller cannot show he suffered any emotional distress. He "must establish more than the fact that [he] felt bad for a period of time." *Ette*, 656 N.W.2d at 71 (citing *Randa v. U.S. Homes, Inc.*, 325 N.W.2d 905, 908 (Iowa Ct. App. 1982)); *see id.* (finding no severe emotional distress where one plaintiff was "uncomfortable," "tired and hungry," and "a little scared," and where another plaintiff was unable to work for three days and "troubled" for six months); *Ollinger v. Bennett*, 562 N.W.2d 167, 173 (Iowa 1997) (upholding trial court's finding of no severe emotional distress where the alleged conduct "exacerbated" the claimant's high blood pressure problem and "contributed to sleepness nights"); *Millington v. Kuba*, 532 N.W.2d 787, 793-94 (Iowa 1995) (affirming grant of summary judgment against plaintiff and finding no severe emotional distress where the record showed that the plaintiff suffered from headaches, insomnia, and loss of appetite). Other than he and his wife's testimony that he was upset and worried and the report regarding his medical treatment on February 21, 2003, Schuller has presented no evidence regarding his emotional condition.[7] The medical doctors who treated him in the emergency room did not assess his emotional condition. Because he has not presented evidence showing he suffered from extreme emotional distress, Schuller cannot meet the third prong of the IIED test.

Likewise, he cannot meet the second prong of the IIED test. The facts Schuller has presented do not show Great-West intentionally caused, or recklessly disregarded the probability of causing emotional distress.

---

[7] Schuller attempted to present testimony about his emotional health via the affidavit of Dr. Cretsinger, his chiropractor, however, in an accompanying order regarding Great-West's Motions to Strike Affidavits, the court has determined that Dr. Cretsinger is not competent to testify about such matters.

Schuller also cannot establish proximate cause, the fourth prong of an IIED claim under Iowa law. Even if the court were to assume Schuller had a stroke on February 21, 2003 (rather than a TIA), it cannot be blamed on any Great-West representatives, including Goodreau or Miller. The record is void of any medical evidence that Schuller's stroke was in anyway caused by his relationship with Great-West. *See Donovan v. State*, 445 N.W.2d 763, 766 (Iowa 1989) (explaining that questions of causation which are beyond the understanding of the layperson require expert testimony). The primary evidence of causation was Schuller's own testimony. Schuller simply does not have the expertise to explain how his stress and stroke were caused by Great-West.

For the foregoing reasons, the court concludes Great-West is entitled to judgment as a matter of law on Count II of the Petition at Law.

## V. CONCLUSION

For the foregoing reasons, Great-West's Motion for Summary Judgment on Counts I and II of the Petition at Law (docket no. 13) is hereby **GRANTED.**

**IT IS SO ORDERED.**

**DATED** this 15th day of September, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA